1

2

3

4

5

6

7

8                        UNITED STATES DISTRICT COURT

9                      SOUTHERN DISTRICT OF CALIFORNIA

10

11   GREGORY A. FRANKLIN,            )   Civil No. 07-0438-WVG
                                     )
12                  Plaintiff,       )   ORDER GRANTING DEFENDANTS'
                                     )   MOTION FOR SUMMARY JUDGMENT
13   v.                              )
                                     )   (Doc. # 139)
14   L. E. SCRIBNER, et al.,         )
                                     )
15                  Defendants.      )
                                     )
16   _____ )

17

18        On March 8, 2007, Plaintiff Gregory A. Franklin (hereafter

19   "Plaintiff"), filed a Complaint pursuant to 42 U.S.C. §1983,

20   alleging his civil rights were violated. Following motions to

21   dismiss and amendments made to the Complaint, on June 24, 2008,

22   Plaintiff filed a Second Amended Complaint (hereafter "SAC"), which

23   is the operative pleading in this case.

24        Plaintiff's SAC names the following Defendants: L.E.

25   Scribner, G.J. Giurbino, J. Ochoa, R. Nelson, M.D. Greenwood, R.

26   Madden, R. Bass, P. Zill, J. Vargas, J. Ortiz, M.E. Bourland, G.

27   Haley, E. Trujillo, S.F. Arias, R. Davis, G. Hopper, and C. Maciel.

28   On March 16, 2009, the District Judge previously assigned to this

07cv0438

1  case issued an Order that dismissed Defendants Madden, Zill, Vargas,

2  Ortiz, Bourland, Haley, Trujillo, Arias, Davis, Hopper and Maciel.

3  Therefore, the Defendants remaining in this action are: Scribner,

4  Giurbino, Ochoa, Nelson, Greenwood, and Bass (hereafter "March 16,

5  2009 Order").

6       The SAC states several causes of action.  The March 16, 2009

7  Order dismissed all of the causes of action in the SAC, except the

8  causes of action for (1) denial of outdoor exercise in violation of

9  the Eighth Amendment,[1] and, (2) inadequate medical care in violation

10 of the Eighth Amendment.

11      In the SAC, Plaintiff consented to have a Magistrate Judge

12 conduct any and all further proceedings in this case, including

13 trial and the entry of final judgment. (SAC at 28).[2] On May 8 and

14 October 29, 2009, Defendants similarly consented. (Doc. ## 111,

15 133).

16      Defendants Scribner, Giurbino, Ochoa, Nelson, Bass and

17 Greenwood filed a Motion for Summary Judgment.  Plaintiff filed an

18 Opposition and Supplemental Opposition to the Motion for Summary

19 Judgment. Defendants filed a Reply to Plaintiff's Opposition.  The

20 Court, having reviewed the Motion for Summary Judgment, Opposition

21 and Supplemental Opposition to the Motion for Summary Judgment, the

22 Reply to the Opposition, and all the documents attached thereto,

23 hereby ORDERS that Defendants' Motion for Summary Judgment is

24 GRANTED.

25

26

27 [1]    The March 16, 2009 Order limited this claim to the time period
        before July 13, 2006, but not thereafter. (March 16, 2009 Order at
        6).

28 [2]    References to page numbers of the SAC are to the ECF pagination.

07cv0438

# I

## FACTUAL BACKGROUND

### A. Allegations in Second Amended Complaint

#### 1. Denial of Fresh Air & Recreation

On August 18, 2005, a riot occurred at the C-Facility at Calipatria State Prison (hereafter "CSP"). Defendant Warden G. Giurbino (hereafter "Giurbino"), placed CSP on lockdown until January 6, 2006. Plaintiff was housed in the A-Facility at CSP, and was not involved in the riot. From August 18, 2005 to January 6, 2006, Plaintiff was denied fresh air and recreation. (SAC at 9).

From January 6, 2006 to March 13, 2006, Defendant Warden L.E. Scribner (hereafter "Scribner"), Chief Deputy Warden T. Ochoa (hereafter "Ochoa"), and Captain M. Greenwood (hereafter "Greenwood"), continued to confine Plaintiff and all inmates to their cells due to an assault on an officer by an inmate. (SAC at 9). From March 13, 2006 to July 13, 2006, Scribner, Ochoa and Defendant Captain R. N. Nelson (hereafter "Nelson"), implemented a policy that allowed Plaintiff and other inmates in the A-Facility one-and-one-half hours of fresh air per week.

Plaintiff alleges that he was confined to his cell on May 15, 16, 18, 21, June 1, 2, 3, 4, 10, 11, 16, 17, 18, 24, 25, 30, July 2, 3, 4, 5, 6, 9[3/], 16, 23, 26, 29, 2006.[4/]

---

[3/]    See footnote 1.

[4/]    Plaintiff also alleges that he was confined to his cell for numerous days in August, September, October, November, December 2006, April May, June, July, August, September, October, November, December 2007, January, February, March, and April 2008. However, see footnote 1.

3

1                     2. Inadequate Medical Care in Violation
                        of the Eighth Amendment

2        On September 7, 2005, Defendant Officer R. Bass (hereafter

3 "Bass"), did not allow Plaintiff to wear his "soft shoes" when

4 Plaintiff was leaving his cell, despite the fact that Plaintiff had

5 a "soft shoe chrono."[5/] Plaintiff suffers from painful callouses on

6 his feet.  In February 2007, Plaintiff had surgery on one of his

7 feet.  Plaintiff's foot condition requires him to walk on the sides

8 of his feet to alleviate the pain in his feet. (SAC at 12).

9        B. Uncontested Material Facts

10        On August 18, 2005, numerous Hispanic inmates at CSP were

11 involved in multiple assaults or attempted murders of correctional

12 staff, which resulted in a lockdown of the prison, and later, a

13 modified program at the prison. (Declaration of G. Giurbino,

14 hereafter "Giurbino Dec." at 2).

15        The report of the August 18, 2005 incidents contains the

16 following information: (a) An inmate struck a correctional officer

17 on the head in the C-Facility of the prison; (b) ten to twenty

18 inmates then surrounded the officer and began to beat and kick him;

19 (c) four inmates chased another officer who had attempted to assist

20 the first officer.  One inmate brandished a weapon.  Therefore, the

21 second officer had to retreat for his own safety. (Declaration of J.

22 Builteman, hereafter "Builteman Dec.", Exh. A, Amended

23 Crime/Incident Report, August 18, 2005).

24        About thirty minutes later, four inmates followed a correc-

25 tional officer from the dining area, struck her in the facial area,

26

27     [5/]    Plaintiff and Defendants do not define the meaning of the word
"chrono."  However, it is the Court's understanding that a "chrono"

28 is a recommendation, usually related to an inmate's medical
condition or course of treatment, issued by a prison physician.

07cv0438

1   and picked her up and slammed her to the ground.  When correctional

2   staff arrived to assist, the four inmates battered those staff

3   members. (Builteman Dec., Exh. A).

4         As this incident occurred, twenty to thirty inmates refused

5   to return to their cells in Facility-C.  The Control Booth Officer

6   in that housing unit noticed several inmates with broken broom

7   handles and activated his alarm. When officers responded to the

8   alarm, the twenty to thirty inmates attacked the responding officers

9   with the broken broom handles, other weapons and their hands and

10  feet.  One inmate, who was stabbing a defenseless officer with a

11  broom handle, was shot and killed by another correctional officer.

12  (Builteman Dec., Exh. A).  The inmate was a known gang member.

13  (Giurbino Dec. at 6).

14        During the seven day period prior to the August 18, 2005

15  incidents, there were two assaults on staff, a battery of a peace

16  officer, a threat to a staff member, a discovery of a live round of

17  ammunition, two incidents of inmates possessing weapons, a battery

18  on an inmate, an attempted battery on an inmate and two mutual

19  combat incidents. (Builteman Dec., Exh. B, Incident Reports Logs).

20        On August 19, 2005, a State of Emergency[6] at CSP was

21  requested and granted by the California Department of Corrections

22  and Rehabilitation (hereafter "CDCR").  A lockdown went into effect

23  which included no outdoor exercise. (Giurbino Dec. at 2).  On the

24  same day, Giurbino was called to CSP and became the Interim Warden.

25  As the Interim Warden, Giurbino was to comprehensively evaluate

26

27  [6]   A State of Emergency is declared at a prison to safely control
      inmate movement, restrict potentially volatile inmates or groups,
      and afford time to evaluate overall operations in order to regain
28    control of the prison and establish order for the safety of staff,
      inmates and visitors. (Declaration of Robert G. Borg in Support of
      Defendants' Motion for Summary Judgment at 3).

CSP's operations to restore safety and security. He was to stay at CSP until the CDCR could recruit a warden to continue his tasks. From August 19, 2005 to the first week of January 2006, Giurbino was responsible for making decisions regarding programming at CSP, including the framework for the modified program, as approved by the Associate Director at CDCR. (Giurbino Dec. at 2).

In January 2006, Scribner became the Warden of CSP. (Declaration of L.E. Scribner, hereafter "Scribner Dec." at 2). At that time, Scribner assumed the responsibility of comprehensively evaluating and establishing prison programming with the purpose of restoring long-term safety and security at CSP. (Scribner Dec. at 2).

Defendants Nelson, Bass, Greenwood, Ochoa, were subordinates of Giurbino and Scribner. Nelson, Bass, Greenwood and Ochoa did not have authority to deviate from the restrictions imposed as set forth in the program status report matrices developed to restore control over CSP. They could not allow outdoor exercise for general population inmates or allow inmates to wear shoes not authorized by the program status reports. (Giurbino Dec. at 2; Scribner Dec. at 2; Nelson Dec. at 2; Greenwood Dec. at 2; Ochoa Dec. at 2; Bass Dec. at 2).

Bass denied Plaintiff's request to wear tennis shoes when Plaintiff was outside of his cell during a September 7, 2005 cell search. Bass had asked his supervisor whether Plaintiff's "Accommodation Chrono" exempted him from the lockdown status report matrix, which required all inmates to wear shower shoes (flip flops) when they were outside their cells. The requirement that inmates wear shower shoes while they were outside their cells was to minimize the

07cv0438

1  risk that inmates could hide weapons in their shoes and commit

2  violent acts with such weapons. (Bass Dec. at 2, Builteman Dec.,

3  Exh. C).

4      Giurbino and Scribner made decisions regarding the lockdown

5  and modified program.  When they made decisions, they considered the

6  August 18, 2005 incidents, the degree of organization that went into

7  the prison-wide assaults, the violence at CSP which had been ongoing

8  and escalating in the past two years unabated by previous efforts to

9  bring the prison population under control, intelligence gathered

10  from inmate interviews and outside influences which could affect the

11  prison population. (Giurbino Dec. at 2; Scribner Dec. at 2).  Their

12  decisions regarding allowable inmate movement and programming were

13  focused on bringing immediate and long-lasting safety to inmates and

14  prison staff.  Their decisions involved extensive evaluation of

15  CSP's facilities and procedures with continual dialogue with the

16  Associate Director of CDCR. (Giurbino Dec. at 3; Scribner Dec. at

17  3).  Significant information was obtained during initial and

18  subsequent inmate interviews and further investigation of the August

19  18, 2005 assaults.  This information included that some inmates were

20  planning future assaults on prison staff members. (Girbino Dec. at

21  3-4).

22      The high level of violence at CSP prior to and on August 18,

23  2005 called for a drastic reestablishment of order.  Otherwise, the

24  level of violence would likely have continued to be more common and

25  more severe. (Declaration of Robert G. Borg, hereafter "Borg Dec.",

26  at 2).

27

28      The purpose of the State of Emergency, lockdown, and modified

07cv0438

1    program at a prison is to safely control inmate movement, restrict

2    potentially volatile inmates or groups, and afford time to evaluate

3    prison operations, in order to regain control of the prison and

4    establish order for the safety of prison staff, inmates and

5    visitors.   Activities such as allowing inmates in an open prison

6    yard and meals in dining rooms create the most severe threats to

7    safety because these activities allow large numbers of unrestrained

8    inmates to be in close proximity to each other and staff, in numbers

9    that far outweigh staff, and allow inmates far greater access to

10   items which could be used as weapons. These activities are the last

11   activities to be returned to normalcy. (Borg Dec. at 3, 5).

12          Shortly after August 19, 2005, exhaustive searches of all

13   cells and all areas accessible to inmates were conducted.   On

14   September 12, 2005, the searches concluded. (Giurbino Dec. at 3).

15          On September 16, 2005, Giurbino requested from the Director

16   of the Division of Adult Institutions to conclude the declared State

17   of Emergency.   At that time, Giurbino advised the Director of the

18   Division of Adult Institutions that CSP would transition to a

19   modified program, which would initially exclude outdoor exercise.

20   The request was granted. (Giurbino Dec. at 3).

21          From August 19, 2005 through January 2006, Giurbino conducted

22   meetings on an almost daily basis to review the modified program,

23   and to evaluate intelligence gathered from cell searches, inmate

24   interviews and other investigative activities.   The daily meetings

25   included briefings by facility and operations administrators and

26   intelligence officers who provided information regarding the status

27   of prison operations.   During this time, Giurbino consulted with the

28   Associate Director of CDCR two to three times per week to discuss

07cv0438

1    the status of prison operations and the modified program. (Giurbino

2    Dec. at 3; Builteman Dec., Exh. C, Program and Status Reports and

3    Minutes).

4        When Scribner assumed the position of Warden of CSP, he

5    continued the meetings with the same regularity, purpose and

6    participants from January 2006 to at least July 13, 2006.  During

7    this time, Scribner continued to consult with the Associate Director

8    of the CDCR two to three times per week to discuss the status of

9    prison operations and the modified program.  His goal was to bring

10   prison activities back to normal programming as soon as possible

11   without sacrificing the safety and security of the prison.

12   Scribner's decisions regarding prison programming were submitted to,

13   and approved by, the Associate Director of the CDCR. (Scribner Dec.

14   at 3).

15       Giurbino believed that it would have been unsafe to expose

16   prison staff to unrestrained general population inmates until those

17   inmates who were planning future assaults were removed from the

18   prison.  Therefore, he determined that inmates classified as higher

19   violence "180 design inmates,"[1/] who were housed in CSP's general

20   population, needed to be identified and transferred to other

21   prisons.  Due to the time involved in reviewing files to identify

22   180-design inmates, hold hearings, and securing another prison able

23

24   to accept the inmate, the transfer of all 180-design inmates to

25   other prisons was not complete in January 2006. (Giurbino Dec. at

26

27   [1/]    Generally, inmates who commit serious offenses while they are housed
        in lower security prisons become classified as 180-design inmates.
        Higher-violence 180-design inmates may be housed at lower security
28      prisons if they have court appearances in a court near the lower
        security prison or while they are awaiting transfer to a higher
        security prison.

07cv0438

4).

As a result of the State of Emergency, 140 inmates had been transferred to other prisons by November 14, 2005.   Another 140 inmates were awaiting transfer.   By December 2, 2005, 236 inmates had been transferred to other prisons.   By December 29, 2005, a total of 297 inmates had been transferred to other prisons. (Borg Dec. at 4).[8/]

In November and December 2005, Giurbino was concerned about the potential for further violence due to the fact that the inmate that was killed during the August 18, 2005 incidents was a known gang member.   Therefore, Giurbino believed that violent retaliation by the gang to which the inmate belonged might occur.   During this time, Giurbino was also concerned about the occurrence of further violence in connection with the then upcoming and well-publicized execution of Stanley "Tookie" Williams, the founder of the Crips gang.   The execution was conducted on December 13, 2005. (Giurbino Dec. at 6).

By November 8, 2005, Giurbino took steps toward normal programming by allowing unrestrained interaction of prison staff with inmates who had passed a risk assessment. He also allowed these inmates greater access to canteen and vendor packages and limited visitation. Additionally, medical personnel walked through the cell blocks to identify and address inmates' medical needs; inmates who

---

[8/]   Plaintiff disputes that only 180-design inmates were transferred to other prisons, and the actual number of inmates transferred to other prisons by the dates noted.   However, Plaintiff does not appear to dispute that inmates were, in fact, transferred to other prisons. Nonetheless, he insists that some inmates were transferred to other prisons for improper reasons. The Court does not see how Plaintiff's evaluations regarding whether an inmate was properly or improperly transferred to another prison is relevant to any issue presented by Defendants' Motion for Summary Judgment.

07cv0438

1   required medical, dental, or mental health care were allowed to

2   attend appointments with doctors; inmates identified with legal

3   deadlines were allowed access to the law library and chaplains and

4   religious volunteers were allowed to walk "the tiers." (Giurbino

5   Dec. at 5).

6        By December 2005, critical workers' movement was unre-

7   strained. Immigration and Naturalization Services (hereafter "INS")

8   inmates were allowed unrestrained movement, but only four inmates at

9   a time were permitted for INS interviews at designated tables.

10  Twelve unrestrained inmates escorted by two correctional officers

11  were allowed access to the law library. Eight unrestrained inmates

12  escorted by one correctional officer were allowed to attend medical

13  appointments. Facility D inmates' movements were unrestrained, were

14  "control fed" in the dining room and had normal education programs

15  restored. (Plaintiff's Exh. C, December 19, 2005 Program Status

16  Report, at 2-3).

17       From August 18, 2005 to July 13, 2006, 230 violent incidents

18  occurred at CSP. These incidents included three incidents of

19  attempted murder of a Peace Officer, twenty-four incidents of

20  battery on a Peace Officer, five incidents of attempted battery on

21  a Peace Officer, forty-eight incidents of inmate possession of

22  weapons, and eighty incidents of inmate battery or mutual combat.

23  (Builteman Dec., Exh. B; Borg Dec. at 13).[9]

24

25  [9]   Plaintiff disputes the actual number of violent incidents that
        reportedly occurred from August 18, 2005 to July 13, 2006. He
26      asserts that 153 violent incidents occurred during that time frame.
        However, even if Plaintiff's number of violent incidents were
27      accepted, the Court finds that the number of (continued)

28
    (continued)
    violent incidents at CSP during the noted time period, was excessive.

07cv0438

On February 2, 2006, Scribner held a meeting to discuss a comprehensive five-phase plan to discontinue the modified program and to resume normal programs over a five-week period beginning on February 6, 2006.  The plan called for the gradual restoration of privileges and programs such as visitation, telephone use, canteen purchases, recreation, and for the implementation of unrestrained inmate movement within housing units.  Under this plan, inmates in Facilities A, B and C, including Plaintiff, were allowed to use the prison exercise yard on a modified schedule.  The modified schedule allowed each Facility a half-day of use of the prison exercise yard one day per week. (Scribner Dec. at 3).

The provision of outdoor exercise to inmates in Administrative Segregation involves prison personnel bringing out restrained inmates one-by-one or in small groups, placing them in the prison yard, prison personnel exiting the prison yard, and then removing the inmates' restraints through a port.  Providing outdoor exercise to the general prison population on this or a similar basis was not appropriate under the circumstances noted above because, (1) there were 2,500 to 3,000 inmates in Facilities A, B and C; (2) the prison does not have available significant number of inmate restraints to be used at the same time in Facilities A, B, and C; (3) the general prison yard fencing does not have ports through which restraints can be removed once an inmate is placed in the yard; (4) committee meetings would have had to have been held for all inmates to determine which inmates could be released into the prison yard together, which would have taken a prohibitive amount of time; (5) considering the number of prison personnel needed for feeding inmates in their cells, providing canteen items to inmates in their

07cv0438

1    cells, and escorting restrained inmates to showers, medical, dental
2    and mental health appointments, law library, visitation and any
3    other movement outside of the inmates' cells, the prison did not
4    have the sufficient number of personnel to escort inmates to the
5    prison yard; and (6) projects to improve the security of the prison
6    yards were ongoing for at least a couple of months after the August
7    18, 2005 incidents. (Giurbino Dec. at 7, Scribner Dec. at 9-10).

8         The provision of outdoor exercise to only non-Hispanic
9    general population inmates in the way inmates in Administrative
10   Segregation were provided outdoor exercise was not appropriate under
11   the circumstances noted above due to the large number of non-
12   Hispanic inmates at the prison, and for the reasons noted above.
13   (Giurbino Dec. at 7, Scribner Dec. at 10).

14        The provision of outdoor exercise to Plaintiff, or a select
15   group of general prison population inmates was not appropriate
16   because approximately 50 new inmates were admitted to CSP every week
17   beginning on August 19, 2005.  The process to allow outdoor exercise
18   to Plaintiff, or to a select group of the general prison population,
19   would have been logistically impossible.  In addition, there would
20   have been the potential for more violence due to special treatment
21   afforded certain inmates, but not to others, or from pressure
22   applied on the new inmates by disruptive inmates to engage in
23   violence. (Giurbino Dec. at 7-8, Scribner Dec. at 10).

24        During the lockdown, Plaintiff exercised in his cell.
25   (Deposition of Gregory A. Franklin, attached to the Declaration of
26   Michelle Des Jardins, hereafter "Plaintiff Deposition," at 27:5-10).

27        From March 13, 2006 to July 13, 2006, Plaintiff and other
28   inmates were allowed one and one-half hours of outdoor exercise per

07cv0438

1  week. (Plaintiff's Points and Authorities in Support of Opposition

2  to Defendants' Motion for Summary Judgment at 4; Declaration of

3  Anthony at 2; Declaration of D. Green at 2).[10/]

4      Plaintiff has callouses on the bottom of his feet. He has had

5  this condition since childhood. (Plaintiff Deposition at 8:6-25 -

6  9:1). In September 2005, Plaintiff had a temporary "Accommodation

7  Chrono," which allowed him to wear soft shoes. (Plaintiff Deposi-

8  tion, Exh. 1). Wearing soft shoes gives Plaintiff ankle support.  In

9  order to alleviate the pain in Plaintiff's feet, he has to walk on

10  the sides of his feet because his callouses are in the middle of his

11  feet.   Tennis shoes give Plaintiff ankle support.   (Plaintiff

12  Deposition at 11:21-25, 12:1-4). Plaintiff requested an "Accommoda-

13  tion Chrono" from a doctor which would have been valid during

14  lockdowns and modified programs.   Plaintiff's request was denied.

15  (Plaintiff Deposition at 41:11-21).  Plaintiff played basketball

16  until 2004 when he injured his knee.  His callous condition did not

17  prevent him from playing basketball. (Plaintiff Deposition at 9:22-

18  25, 10:1-12). Plaintiff no longer has the "Accommodation Chrono,"

19  which allowed him to wear soft shoes. (Plaintiff Deposition at 43:4-

20  17).

21      On September 7, 2005, during the lockdown, Defendant Bass

22  came to search Plaintiff's cell. (SAC at 12). Plaintiff was required

23  to leave his cell for the cell search. (Bass Dec. at 2; Plaintiff

24  Deposition at 13:18-25 - 14:1-13).

25      Under the restrictions imposed by the lockdown program status

26  reports, all inmates were permitted to wear only shower shoes (flip

27

28  _____

[10/]   Inmates Anthony and Green state that beginning in May 2006, they
        were allowed two hours of outdoor exercise for two months.

14

07cv0438

1   flops) when outside of their cells because of the risk that inmates

2   could secrete weapons in their shoes and commit violent acts. (Bass

3   Dec. at 2). Plaintiff asked Bass if he could wear his tennis shoes

4   outside his cell while the cell was being searched. Bass asked his

5   supervisor if Plaintiff's Accommodation Chrono for soft shoes

6   exempted him from the lockdown restriction. Bass was instructed that

7   the Accommodation Chrono did not overrule custody issues and that

8   for security reasons, Plaintiff could not wear his tennis shoes when

9   he left his cell during the cell search. (Bass Dec. at 2).[11]/

10      Plaintiff was required to wear his shower shoes when he left

11  his cell for the cell search.  He was required to walk to the day

12

13

14  room, which is no more than 150 feet away from any cell. (Bass Dec.

15  at 2).[12]/

---

[11]/   Plaintiff disputes that Bass' supervisor told Bass that Plaintiff was not allowed to wear tennis shoes when he exited his cell so it could be searched. Plaintiff cites to the responses to interrogatories by Bass to support this assertion. However, the interrogatory responses to which Plaintiff refers do not support Plaintiff's assertion. Further, Plaintiff admits that he believed that Bass asked his supervisor about allowing Plaintiff to wear tennis shoes when he had to exit his cell for the cell search. (Plaintiff Deposition at 14:23-25, 15:1).

[12]/   Plaintiff argues that if an inmate has a medical chrono to wear tennis shoes when he exits his cell, he could have worn tennis shoes after his shoes and feet were searched. Plaintiff cites to the supplemental interrogatory responses by Giurbino to support this assertion. However, Plaintiff misconstrues Giubino's supplemental responses. Giurbino objected to responding to Plaintiff's interrogatory seeking this information. After the objections were stated, Giurbino specifically stated: "At Calipatria State Prison, *during times of modified program, all inmates are required to exit their cells wearing... shower shoes.* However, regardless of the type of shoes an inmate is wearing, during searches, inmates are required to remove their shoes to allow inspection of the foot covering and the inmate's feet, by custody staff." (emphasis added)(Defendants' Lodgment No. 1, Giurbino's Supplemental Responses to Plaintiff's First Set of Interrogatories, at 8). Plaintiff also cites to his own Declaration to posit the same argument. (Franklin Dec. at 1).

[12]/   Plaintiff states that he had to walk 100 yards to the day room. (Plaintiff Deposition at 14:4-6).

07cv0438

Bass did not know that Plaintiff's walking the short distance from his cell to the day room in shower shoes would cause Plaintiff to suffer cruel and unusual punishment. Bass did not intend to subject Plaintiff to cruel and unusual punishment. Bass was complying with his orders, which he had no discretion to disregard. (Bass Dec. at 2).

II

ANALYSIS

A. Standard of Review for Motion for Summary Judgment

Summary judgment is properly granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The court shall consider all admissible affidavits and supplemental documents submitted on a motion for summary judgment. See Connick v. Teachers Ins. & Annuity Ass'n, 784 F.2d 1018, 1020 (9th Cir. 1986). The moving party has the initial burden of demonstrating that summary judgment is proper. Adickes v. S. H. Kress & Co., 398 U.S. 144, 152 (1970). However, to avoid summary judgment, the nonmovant cannot rest solely on conclusory allega-tions. Berg v. Kincheloe, 794 F.2d 457, 459 (9th Cir. 1986). Rather, he must present "specific facts showing there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). The Court may not weigh evidence or make credibility determinations on a motion for summary judgment. Quite the opposite, the inferences

07cv0438

1   to be drawn from the underlying facts must be viewed in the light

2   most favorable to the nonmoving party. Id. at 255; United States v.

3   Diebold, Inc., 369 U.S. 654, 655 (1962). The nonmovant's evidence

4   need only be such that a "fair minded jury could return a verdict

5   for [him] on the evidence presented." Anderson, 477 U.S. at 255.

6   However, in determining whether the nonmovant has met his burden,

7   the Court must consider the evidentiary burden imposed upon him by

8   the applicable substantive law. Id. A verified complaint or motion

9   may be used as an opposing affidavit under Fed.R.Civ.P. 56 to the

10   extent it is based on personal knowledge and sets forth specific

11   facts admissible in evidence. McElyea v. Babbitt, 833 F.2d 196, 197-

12   98 (9th Cir. 1987); Johnson v. Meltzer, 134 F.3d 1393, 1399-1400

13   (9th Cir. 1998) (motion). To "verify" a complaint, the plaintiff

14   must swear or affirm that the facts in the complaint are true "under

15   the pains and penalties of perjury." Schroeder v. McDonald, 55 F.3d

16   454, 460 n.10 (9th Cir. 1995).

17        B. Defendants' Arguments

18        Defendants argue that they are entitled to judgment as a

19   matter of law pursuant to Fed.R.Civ.P. 56 because:

20   1) no genuine issues of material fact exist to show that the

21   restrictions on Plaintiff's access to outdoor exercise deprived him

22   of his Eighth Amendment rights; 2) no genuine issues of material

23   fact exist to show that Defendants acted with deliberate indiffer-

24

25   ence to Plaintiff's health or safety; and 3) Defendants are entitled

26   to qualified immunity.

27        1. 42 U.S.C. § 1983

28        Section 1983 authorizes a "suit in equity, or other proper

07cv0438

1  proceeding for redress" against any person who, under color of state

2  law, "subjects, or causes to be subjected, any citizen of the United

3  States... to the deprivation of any rights, privileges, or immuni-

4  ties secured by the Constitution." Nelson v. Campbell, 541 U.S. 637

5  (2004). Here, there is no dispute that Giurbino and Scribner acted

6  under color of state law when they ordered implementation of

7  lockdown procedures at CSP which limited Plaintiff's access to

8  outdoor exercise from August 19, 2005 through March 13, 2006, and

9  for 22 days in May, June, and July 2006.[13/] Thus, the resolution of

10  Defendants' Motion for Summary Judgment turns on the second inquiry:

11  whether a genuine issue of material fact exists to show that

12  Defendants' actions constituted cruel and unusual punishment in

13  violation of Plaintiff's Eighth Amendment rights.

14         2. Eighth Amendment's Cruel and Unusual
              Punishment Clause

15              "Whatever rights one may lose at the prison gates,... the

16  full protections of the eighth amendment most certainly remain in

17  force. The whole point of the amendment is to protect persons

18  convicted of crimes." Spain v. Procunier, 600 F.2d 189, 193-94 (9th

19  Cir. 1979). However, the Eighth Amendment is not a basis for broad

20  prison reform. It requires neither that prisons be comfortable nor

21  that they provide every amenity that one might find desirable.

22  Rhodes v. Chapman, 452 U.S. 337, 347, 349 (1981); Hoptowit v. Ray,

23  682 F.2d 1237, 1246 (9th Cir. 1982). Rather, the Eighth Amendment

24  proscribes the "unnecessary and wanton infliction of pain," which

25  includes those sanctions that are "so totally without penological

26  justification that it results in the gratuitous infliction of

27

28  [13/]   The period from August 19, 2005 through March 13, 2006 is 6 months
          23 days.  Also, see footnote 1.

18

07cv0438

suffering." <u>Gregg v. Georgia</u>, 428 U.S. 153, 173, 183 (1976); <u>see also</u> <u>Farmer v. Brennan</u>, 511 U.S. 825, 834 (1994); <u>Rhodes</u>, 452 U.S. at 347. This includes not only physical torture, but any punishment incompatible with "the evolving standards of decency that mark the progress of a maturing society." <u>Trop v. Dulles</u>, 356 U.S. 86, 101 (1958); <u>see also</u> <u>Estelle v. Gamble</u>, 429 U.S. 97, 102 (1976). Although prison administrators generally have broad discretion in determining whether to declare emergencies and impose "lockdowns" to control institutional disturbances, the conditions imposed during the lockdown may constitute cruel and unusual punishment under the Eighth Amendment. <u>See</u> <u>Hayward v. Procunier</u>, 629 F.2d 599, 603 (9th Cir. 1980) (denial of outdoor exercise may give rise to Eighth Amendment violation even in response to emergency conditions). To assert an Eighth Amendment claim for deprivation of humane conditions of confinement, a prisoner must satisfy two requirements: one objective and one subjective. <u>Farmer</u>, 511 U.S. at 834; <u>Allen v. Sakai</u>, 48 F.3d 1082, 1087 (9th Cir. 1994).

"Under the objective requirement, the prison official's acts or omissions must deprive an inmate of the minimal civilized measure of life's necessities." <u>Farmer</u>, 511 U.S. at 834. This objective component is satisfied so long as the institution "furnishes sentenced prisoners with adequate food, clothing, shelter, sanitation, medical care, and personal safety." <u>Hoptowit</u>, 682 F.2d at

1246; <u>Farmer</u>, 511 U.S. at 833; <u>Wright v. Rushen</u>, 642 F.2d 1129, 1132-33 (9th Cir.1981).

The subjective requirement, relating to the defendants' state of mind, requires "deliberate indifference." <u>Allen</u>, 48 F.3d at 1087.

07cv0438

1   "Deliberate indifference" exists when a prison official "knows of

2   and disregards an excessive risk to inmate health and safety; the

3   official must be both aware of facts from which the inference could

4   be drawn that a substantial risk of serious harm exists, and he must

5   also draw the inference." <u>Farmer</u>, 511 U.S. at 835.

6                    a. <u>Objective Requirement</u>

7        Plaintiff alleges that the conditions resulting from

8   Giurbino's and Scribner's decision to implement a lockdown and

9   modified lockdown restrictions constituted cruel and unusual

10  punishment because, as a result of those restrictions, he was denied

11  outdoor exercise for over seven months.[14] The Ninth Circuit has

12  stated that "regular outdoor exercise is extremely important to the

13  psychological and physical well being of the inmates." <u>Spain</u>, 600

14  F.2d at 199 (holding that prisoners in long-term and continuous

15  segregation must be provided regular outdoor exercise unless

16  "inclement weather, unusual circumstances, or disciplinary needs"

17  make it impossible). However, as the Ninth Circuit further recog-

18  nized in <u>Hayward</u>, when a lockdown is instituted in response to a

19  genuine emergency, the decisions regarding when and how to provide

20  for outdoor exercise "are delicate ones, and those charged with them

21  must be given reasonable leeway." <u>Hayward</u>, 629 F.2d at 603.

22

23      When prison officials balance the obligation to provide

24  safety for inmates and prison staff against the duty to accord

25  inmates the rights and privileges to which they are entitled, prison

26  officials are afforded "wide-ranging deference." <u>Norwood v. Vance</u>,

27

28  [14]   See footnote 13. Six months 23 days plus an additional 22 days
             totals 7 months 15 days.

07cv0438

1    591 F. 3d 1062, 1069 (9th Cir. 2010), citing <u>Bell v. Wolfish</u>, 441

2    U.S. 520, 547 (1979).  When a "lockdown (is) in response to a

3    'genuine emergency,' and restrictions (are) eased as prison

4    (officials) determine in view of the emergency, courts may not...

5    second-guess prison officials' judgments about when outdoor exercise

6    could safely be restored." <u>Norwood</u>, 591 F.3d at 1069.

7         When prison officials have substantial reasons for imposing

8    a lockdown, for example, wide-spread violence and riots, they are

9    tasked with restoring order and safety in the prison.  Under these

10   circumstances, the lockdown is not intended to be punitive. <u>Norwood</u>,

11   591 F.3d 1069.

12        Prison officials have the duties to keep inmates safe from

13   each other and to protect prison staff from being attacked.  Prison

14   officials must balance these duties against other obligations that

15   the law imposes, such as providing outdoor exercise.  When violence

16   at the prison rises to extremely high levels, "prison officials have

17   a right and a duty to take steps to reestablish order in a prison

18   when such order is lost.  This is for the benefit of the prisoners

19   as much as for the benefit of the prison officials." <u>Id.</u>, at 1069,

20   quoting <u>Farmer</u>, 511 U.S. at 832-833; <u>LeMaire v. Maass</u>, 12 F. 3d

21   1444, 1462 (9th Cir. 1993); <u>Hoptowit</u>, 682 F.2d at 1259.

22        Prison officials may be faulted for erring on the side of

23   caution by maintaining a lockdown for longer than necessary.  "But

24

25   when it comes to matters of life and death, erring on the side of

26   caution is a virtue." <u>Norwood</u>, 591 F.3d at 1069.

27        "Although exercise is 'one of the basic human necessities

28   protected by the Eighth Amendment' ... a temporary denial of outdoor

1   exercise with no medical effects is not a substantial deprivation."

2   May v. Baldwin, 109 F.3d 557, 565 (9th Cir. 1997) (twenty-two days

3   insufficient to establish Eighth Amendment violation) (quoting

4   LeMaire, 12 F.3d at 1457).

5       Here, the record is clear that the initial and later

6   restrictions placed on Plaintiff's ability to exercise outdoors

7   arose from violent incidents prior to August 18, 2005 and the riot

8   that occurred at CSP on that date.  As a result of the pre-riot

9   violence and the riot, Giurbino, and later Scribner, implemented a

10  lockdown the day after the riot.  The lockdown  provided for the

11  transfer out of the prison of inmates who were deemed to be a higher

12  risk for violence, in-cell feeding, controlled showers, and later,

13  unrestrained prison staff interaction with inmates under certain

14  circumstances, canteen access, library access for inmates with

15  verified court deadlines, limited visitation, and allowance of

16  inmates to attend medical, dental or mental heath care appointments

17  with doctors.

18      Although Plaintiff claims he was denied outdoor exercise for

19  over seven months, Defendants argue that he was not denied exercise

20  altogether, but rather, only the opportunity to exercise outdoors.

21  Specifically, Defendant claims the conditions of Plaintiff's

22  confinement during the lockdown do not satisfy the objective

23  component of an Eighth Amendment violation because Plaintiff was not

24

25  confined to his cell during the entire lockdown period and he

26  exercised in his cell during the lockdown period.

27      Under the circumstances of this case and Ninth Circuit

28  precedent, however, the Court finds evidence in the record suffi-

07cv0438

cient to create genuine issues of fact as to whether the denial and/or limitations on Plaintiff's outdoor exercise for a period of over seven months meets the objective standard required to support an Eighth Amendment violation.[15]/ *See e.g.,* Lopez v. Smith, 203 F.3d 1122, 1133 (9th Cir. 2000) (finding six and one-half weeks depriva- tion of "all access to outdoor exercise" sufficient to satisfy Eighth Amendment's objective requirements); Keenan v. Hall, 83 F.3d 1083, 1089 (9th Cir. 1996), *as amended* 135 F.3d 1318 (finding triable issues of fact existed as to whether a six-month deprivation of outdoor exercise due to Plaintiff's placement in the Intensive Management Unit violated the Eighth Amendment).

### b. Subjective Requirement

However, in order to avoid summary judgment, Plaintiff must also show there are triable issues as to the Eighth Amendment's subjective requirement. Farmer, 511 U.S. at 834. In this regard, the Court finds no evidence in the record to support Plaintiff's claim that the denial of outdoor exercise, which began as a result of violent incidents prior to, and the riot that occurred on, August 18, 2005, was the result of Defendant's "deliberate indifference." Farmer, 511 U.S. at 835; Lopez, 203 F.3d at 1133. The evidence before the Court shows that the suspension of outdoor exercise began after a riot occurred on August 18, 2005, in which inmates at CSP were involved in multiple assaults and attempted murders of CSP's correctional staff. One inmate was shot and killed during the riot.

---

[15]/   Plaintiff argues that other inmates in the general population of CSP were afforded outdoor exercise beginning on August 19, 2005. Plaintiff cites to the Builteman Dec., and the responses to interrogatories by Giurbino, Scribner, Greenwood and Ochoa to support his assertion. However, the documents to which Plaintiff refers do not support Plaintiff's assertion. None of these documents indicate that general population inmates were afforded outdoor exercise beginning on August 19, 2005.

07cv0438

Giurbino and Scribner indicate that the lockdown was imposed so that they could comprehensively evaluate CSP's operations to restore safety and security at CSP.  When Giurbino and Scribner made decisions regarding the lockdown, and later, the modified program, they considered the August 18, 2005 incidents, the degree of organization that went into the prison-wide assaults, the violence at CSP which had been ongoing despite previous efforts to bring the prison population under control, intelligence gathered from inmate interviews, and outside influences which could affect the prison population.  Significant information was obtained during inmate interviews and investigation into the events of August 18, 2005. This information included that some inmates were planning future assaults on prison staff members.  Plaintiff does not point to any evidence in the record to rebut Giurbino's and Scribner's explanations for the lockdown, and later, the modified program.

Thus, the record is replete with facts which reveal that restrictions on outdoor exercise were instituted for the primary purpose of preventing further violence, injuries and homicides. In addition, all documentary evidence offered by both Plaintiff and Defendants shows, that the lockdown and later, modified program, were designed to restore safety and security at CSP as soon as reasonably practical. There is simply no evidence before this Court which supports Plaintiff's claims that Defendants' actions were the product of any "deliberate indifference" on their part. Farmer, 511 U.S. at 837.[16]

As noted above, determinations such as how to best protect inmates from violence "are delicate ones, and those charged with

---

[16]/   See footnote 15.

07cv0438

them must be given reasonable leeway." <u>Hayward</u>, 629 F.2d at 602. Therefore, prison officials are afforded wide-ranging deference in making these determinations. <u>Norwood</u>, 591 F.3d at 1069. Defendants have demonstrated as a matter of law that outdoor exercise restrictions at CSP were imposed as a result of a serious violent incidents and a riot at CSP.  Thus, without more, this Court finds no genuine issues of material fact exist to show that Defendants deprived Plaintiff of outdoor exercise with the "deliberate indifference" to his health or safety necessary to support an Eighth Amendment violation. <u>See</u> <u>Farmer</u>, 511 U.S. at 835. Rather, the uncontroverted evidence establishes that the suspension of outdoor exercise was a response to ongoing violence and the riot that occurred on August 18, 2005. Plaintiff has come forward with no evidence to support a finding that the initial suspension or delay in restoration of outdoor exercise amounted to a violation of his Eighth Amendment rights.

Accordingly, Defendants are entitled to summary judgment as a matter of law. <u>Celotex</u>, 477 U.S. at 322-24; <u>Anderson</u>, 477 U.S. at 256; <u>Berg</u>, 794 F.2d at 459.

### 3. <u>Defendants Ochoa, Greenwood, and Nelson Are Not Liable for an Eighth Amendment Violation</u>

Plaintiff contends that Defendants Ochoa and Greenwood denied him outdoor exercise from January 6, 2006 to March 13, 2006 and from March 20, 2006 to May 10, 2006.  Plaintiff also contends that from March 13, 2006 to July 13, 2006, Defendants Ochoa and Nelson implemented a policy that only allowed inmates in Plaintiff's facility one-and-one-half hours of outdoor exercise per week. (SAC at 9-10).

*Respondeat Superior* liability does not exist under § 1983.

07cv0438

1    <u>Monell v. New York Dept. of Soc. Svcs.</u>, 436 U.S. 658, 691 (1978);

2    <u>Jones v. Williams</u>, 297 F.3d 930, 934 (9th Cir. 2002). "(A) plaintiff

3    must plead that each Government-official defendant, through the

4    official's own individual actions, has violated the Constitution."

5    <u>Ashcroft v. Iqbal</u>, 129 S.Ct. 1937, 1948 (2009).  Causation must be

6    established by showing acts and omissions of each defendant. <u>See</u>

7    <u>Rizzo v. Goode</u>, 423 U.S. 362, 370-371 (1976); <u>Leer v. Murphy</u>, 844

8    F.2d 628, 633 (9th Cir. 1988). "The inquiry into causation must be

9    individualized and focus on the duties and responsibilities of each

10   defendant whose acts or omissions are alleged to have set forth a

11   constitutional deprivation." <u>Id.</u> at 633.

12       Here, the undisputed facts presented to the Court show that

13   only the warden had the authority to institute the lockdown and

14   modified program at the prison.  The warden's decisions regarding

15   the lockdown and modified program were subject to the approval of

16   the CDCR. Ochoa, Greenwood, and Nelson did not have authority to

17   allow Plaintiff or other inmates outdoor exercise when this activity

18   was not authorized by the warden. Since Ochoa, Greenwood, and Nelson

19   did not have the duties, responsibilities, or authority to institute

20   the lockdown or modified program, nor the restrictions attendant

21   therewith, they can not be held liable for an Eighth Amendment

22   violation under the circumstances presented.

23       As a result, Defendants Ochoa, Greenwood, and Nelson are

24   entitled to summary judgment as a matter of law. <u>Celotex</u>, 477 U.S.

25   at 322-324; <u>Anderson</u>, 477 U.S. at 256; <u>Berg</u>, 794 F.2d at 459.

26           4. <u>Defendant Bass Did Not Violate Plaintiff's Eighth</u>
             <u>Amendment Rights</u>

27       Plaintiff contends that on September 7, 2010, Defendant Bass

28   did not allow Plaintiff to wear his "soft shoes" when Plaintiff was

07cv0438

exiting his cell so his cell could be searched. Therefore, Plaintiff asserts that Bass violated his Eighth Amendment right to be free from cruel and unusual punishment. Defendant Bass argues that when he prohibited Plaintiff from wearing "soft shoes," he was following the orders of his superiors and did not intend to cause Plaintiff to suffer in violation of Plaintiff's Eighth Amendment rights.

As previously noted, Plaintiff has callouses on the bottom of his feet. In September 2005, Plaintiff had a temporary "Accommodation Chrono," which allowed him to wear soft shoes. Wearing soft shoes gives Plaintiff ankle support. In order to alleviate the pain in Plaintiff's feet, he has to walk on the sides of his feet because his callouses are in the middle of his feet.  Tennis shoes give Plaintiff ankle support. Plaintiff requested an "Accommodation Chrono" from a doctor which would have been valid during lockdowns and modified programs. Plaintiff's request was denied. Plaintiff played basketball until 2004 when he injured his knee. His callous condition did not prevent him from playing basketball. Plaintiff no longer has the "Accommodation Chrono," which allowed him to wear soft shoes. (Plaintiff Deposition at 43:4-17).

On September 7, 2005, during the lockdown, Defendant Bass came to search Plaintiff's cell. Plaintiff was required to leave his cell for the cell search.

Under the restrictions imposed by the lockdown program status reports, all inmates were permitted to wear only shower shoes (flip flops) when outside of their cells because of the risk that inmates could secrete weapons in their shoes and commit violent acts. (Bass Dec. at 2). Plaintiff asked Bass if he could wear his tennis shoes when he exited his cell while it was being searched. Bass asked his

supervisor if Plaintiff's Accommodation Chrono for soft shoes exempted him from the lockdown restriction. Bass was instructed that the Accommodation Chrono did not overrule custody issues and that for security reasons, Plaintiff could not wear his tennis shoes when he left his cell during the cell search.

Plaintiff was required to wear his shower shoes when he left his cell for the cell search.  He was required to walk to the day room, which is no more than 150 feet or 100 yards away from any cell.

Bass did not know that Plaintiff's walking the short distance from his cell to the day room in shower shoes would cause Plaintiff to suffer cruel and unusual punishment. Bass did not intend to subject Plaintiff to cruel and unusual punishment. Bass was complying with his orders, which he had no discretion to disregard.

a. Eighth Amendment's Cruel and Unusual
Punishment Clause

As previously noted, the Eighth Amendment proscribes the "unnecessary and wanton infliction of pain," which includes those sanctions that are "so totally without penological justification that it results in the gratuitous infliction of suffering." Gregg, 428 U.S. at 173, 183; see also Farmer, 511 U.S. at 834; Rhodes, 452 U.S. at 347. Although prison administrators generally have broad discretion in determining whether to declare emergencies and impose "lockdowns" to control institutional disturbances, the conditions imposed during the lockdown may constitute cruel and unusual punishment under the Eighth Amendment. See Hayward v. Procunier, 629 F.2d at 603. Deliberate indifference to serious medical needs may support a claim for violation of the Eighth Amendment. Estelle, 429 U.S. at 104.

07cv0438

Deliberate indifference must be analyzed in the context of the specific case. In applying the deliberate indifference standard, the trier of fact "must consider whether, in allegedly exposing the prisoner to danger, the defendant prison official was guided by consideration of safety to other inmates... More generally, the legal standard must not be applied to an idealized vision of prison life, but to the prison as it exists, and as prison official(s) are realistically capable of influencing." Berg, 794 F.2d at 462. An analysis of the context in which prison officials act requires the trier of fact to recognize the turbulent environment of a prison. "Prisons by definition, are places of involuntary confinement of persons who have a demonstrated proclivity for antisocial, criminal and often violent conduct." Hudson v. Palmer, 468 U.S. 517, 526 (1984).

Also, as previously noted, an Eighth Amendment violation requires proof of an objective and subjective requirement. "Under the objective requirement, the prison official's acts or omissions must deprive an inmate of the minimal civilized measure of life's necessities." Farmer, 511 U.S. at 834. This objective component is satisfied so long as the institution "furnishes sentenced prisoners with adequate food, clothing, shelter, sanitation, medical care, and

personal safety." Hoptowit, 682 F.2d at 1246; Farmer, 511 U.S. at 833; Wright v. Rushen, 642 F.2d 1129, 1132-33 (9th Cir.1981).

The subjective requirement, relating to the defendants' state of mind, requires "deliberate indifference." Allen, 48 F.3d at 1087. "Deliberate indifference" exists when a prison official "knows of and disregards an excessive risk to inmate health and safety; the

07cv0438

official must be both aware of facts from which the inference could
be drawn that a substantial risk of serious harm exists, and he must
also draw the inference." <u>Farmer</u>, 511 U.S. at 835.

1. <u>Objective Requirement</u>

Plaintiff alleges that on one occasion, Bass did not allow
him to wear his "soft shoes," when he had to exit his cell for a
cell search.  Plaintiff claims that he needed to wear his tennis
shoes instead of his shower shoes so that he could walk on the sides
of his feet instead of on the bottoms of his feet because his
callouses were on the center-bottoms of his feet.  Plaintiff claims
that shower shoes did not provide him with enough ankle support to
walk on the sides of his feet.  Further, Plaintiff states that many
times when the prison was on lockdown or modified program, and his
cell was searched, he was allowed to wear tennis shoes after a
correctional officer searched his tennis shoes. (Dec. of Franklin at
1). Plaintiff also offers the Declaration of Darryl Douglas, a
fellow inmate, which generally states that Douglas has been subject
to lockdowns and modified programs, has a medical chrono, and has
been allowed to wear his soft shoes and take other medical equipment
with him when a search of his cell was conducted.

When prison officials balance the obligation to provide
safety for inmates and prison staff against the duty to accord
inmates the rights and privileges to which they are entitled, prison
official are afforded "wide-ranging deference." <u>Norwood</u>, 591 F. 3d
at 1069.

When prison officials have substantial reasons for imposing
a lockdown, for example, wide-spread violence and riots, they are
tasked with restoring order and safety in the prison.  Under these

circumstances, the lockdown is not intended to be punitive. <u>Norwood</u>, 591 F.3d 1069.

Prison officials have the duties to keep inmates safe from each other and to protect prison staff from being attacked.  Prison officials must balance these duties against other obligations that the law imposes, such as providing outdoor exercise.  When violence at the prison rises to extremely high levels, "prison officials have a right and a duty to take steps to reestablish order in a prison when such order is lost.  This is for the benefit of the prisoners as much as for the benefit of the prison officials." <u>Id.</u>, at 1069, quoting <u>Farmer</u>, 511 U.S. at 832-833; <u>LeMaire</u>, 12 F. 3d at 1462; <u>Hoptowit</u>, 682 F.2d at 1259.

Prison officials may be faulted for erring on the side of caution by maintaining a lockdown for longer than necessary. "But when it comes to matters of life and death, erring on the side of caution is a virtue." <u>Norwood</u>, 591 F.3d at 1069.

Here, the record is clear that on September 7, 2005, Plaintiff had a temporary "Accommodation Chrono," which allowed him to wear soft shoes, due to his callous condition. It is also clear that under the restrictions imposed by the lockdown, Plaintiff was only permitted to wear shower shoes when he was outside of his cell. This restriction was imposed because inmates could secrete weapons in their shoes. When Plaintiff asked Bass if he could wear his tennis shoes when he exited his cell, Bass asked his supervisor if Plaintiff's Accommodation Chrono exempted him from the lockdown restriction. Bass was told that the Accommodation Chrono did not overrule the lockdown restriction and that for security reasons, Plaintiff could not wear his tennis shoes.  Further, the record is

07cv0438

clear that on other occasions, Plaintiff and at least one other inmate with an Accommodation Chrono which allowed them to wear soft shoes, were allowed to exit their cells wearing soft shoes, after their shoes were searched.

Although Plaintiff claims that he suffered cruel and unusual punishment and deliberate indifference to his medical needs in being prohibited from wearing his soft shoes on one particular day, September 7, 2005, Bass argues that Plaintiff's callous condition was not so severe nor was Plaintiff required to perform activities in which he had to place significant pressure on the center-bottoms of his feet. Specifically, Bass claims that preventing Plaintiff to wear soft shoes on one occasion does not satisfy the objective component of an Eighth Amendment violation.

However, under the circumstances of this case and Ninth Circuit precedent, the Court finds evidence in the record sufficient to create genuine issues of fact as to whether disallowing Plaintiff to wear soft shoes during the lockdown, when he had an Accommodation Chrono for soft shoes, and had been allowed to wear soft shoes during other times when the prison was on lockdown, meets the objective standard required to support an Eighth Amendment viola-tion. The Court has not been presented with any explanation why, on September 7, 2005, while Plaintiff's cell was searched, he could not wear his tennis shoes after the shoes were searched by a correc-tional officer.

## 2. Subjective Requirement

However, in order to avoid summary judgment, Plaintiff must also show there are triable issues as to the Eighth Amendment's subjective requirement. Farmer, 511 U.S. at 834. In this regard, the

07cv0438

Court finds no evidence in the record to support Plaintiff's claim
that Bass' refusal to allow Plaintiff to wear his soft shoes while
his cell was searched was the result of Bass' "deliberate indiffer-
ence." <u>Farmer</u>, 511 U.S. at 835; <u>Lopez</u>, 203 F.3d at 1133. The
evidence before the Court shows that Bass did not know that
Plaintiff's walking the short distance from his cell to the dayroom
would cause Plaintiff to suffer an excessive risk to his health.
Further, Bass did not disregard any risk to Plaintiff's health.
Instead, the contrary is true. He asked his supervisor whether
Plaintiff's Accommodation Chrono exempted Plaintiff from the
lockdown restriction that Plaintiff wear shower shoes when he exited
his cell.  He was instructed that Plaintiff had to wear his shower
shoes when he exited his cell. Bass complied with his orders, which
he had no discretion to disregard.

As noted above, determinations such as how to best protect
inmates from violence "are delicate ones, and those charged with
them must be given reasonable leeway." <u>Hayward</u>, 629 F.2d at 602.
Therefore, prison officials are afforded wide-ranging deference in
making these determinations. <u>Norwood</u>, 591 F.3d at 1069.

Defendants have demonstrated as a matter of law that Bass did
not violate Plaintiff's Eighth Amendment rights. Therefore, the
Court finds no genuine issue of material fact to show that Bass
acted with "deliberate indifference" to Plaintiff's health in
disallowing Plaintiff to wear soft shoes, necessary to support an
Eighth Amendment violation.  See <u>Farmer</u>, 511 U.S. at 835; <u>Estelle</u>,
429 U.S. at 104.

Accordingly, Bass is entitled to summary judgment as a matter
of law. <u>Celotex</u>, 477 U.S. at 322-324; <u>Anderson</u>, 477 U.S. at 256;

07cv0438

1   Berg, 794 F.2d at 459.

2                   5. Qualified Immunity

3        Since the Court has found no violation of Plaintiff's Eighth

4   Amendment rights, the Court need not reach any issues regarding

5   qualified immunity. "The better approach to resolving cases in which

6   the defense of qualified immunity is raised is to determine first

7   whether the plaintiff has alleged the deprivation of a constitu-

8   tional right at all." See County of Sacramento v. Lewis, 523 U.S.

9   833, 841, n. 5 (1998). "If no constitutional right would have been

10  violated were the allegations established, there is no necessity for

11  further inquiries concerning qualified immunity." Saucier v. Katz,

12  533 U.S. 194, 201 (2001).

13                            III

14                   CONCLUSION AND ORDER

15       For the reasons set forth in this Order, the Court hereby

16  GRANTS Defendants' Motion for Summary Judgment pursuant to Fed. R.

17

18

19

20

21

22

23  Civ. P. 56.

24       The Clerk shall enter judgment for Defendants and close the

25  file.

26  IT IS SO ORDERED.

27

28  DATED:   September 29, 2010

07cv0438

1

2

3       Hon. William V. Gallo
        U.S. Magistrate Judge
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

07cv0438